IN THE UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF TEXAS
AMARILLO DIVISION

FIRST SECURITY BANK,         §
        §
      Plaintiff,         §
        §
v.         §         No. 2:19-CV-91-Z
        §
W & W FARMS, INC.,         §
        §
      Defendant.         §

**MEMORANDUM OPINION AND ORDER**

This matter comes before the Court on W&W Farms, Inc.'s Motion for Temporary Restraining Order, filed January 31, 2020 (ECF No. 22) ("Motion for TRO"). Defendant moves for a temporary restraining order against Plaintiff to prevent Plaintiff from: (i) conducting the Substitute Trustee's Sale scheduled for February 4, 2020 in Hansford County, Texas; (ii) subsequently posting the property for foreclosure; (iii) otherwise selling or taking possession of the property related to this litigation; and (iv) otherwise disturbing or attempting to disturb Defendant's peaceable possession and enjoyment of its property during the pendency of this cause. Motion for TRO at 1.

Having reviewed the Motion for TRO and parties' other filings on this motion, the Court DENIES Defendant's motion for a temporary restraining order. Specifically, the Court concludes that Defendant cannot satisfy its heavy burden of showing a substantial likelihood of success on the merits absent a temporary restraining order.

In 2017 and 2018, the Defendant executed three promissory notes payable to the Plaintiff in the total principal amount of $1,047,653.00 with a variable interest rate on each loan. *See* Plaintiff's Original Complaint ¶¶ 6-9, at 1-2, filed April 23, 2019 (ECF No. 1) ("Complaint"); Defendant's Original Answer and Counter-Claim ¶¶ 6-8, at 2, filed May 29, 2019 (ECF No. 10) ("Answer"). The Defendant pledged all farm and ranch machinery and equipment, all livestock, and all crops on its farms as security for the loans. *See* Complaint ¶¶ 7, 10 & 13, at 2; Answer ¶¶ 7-9, at 2. The payment schedule for the loans is reflected in the table below.

| Loan number | Execution date | Principal | Interest rate | First payment due | Number of payments |
|---|---|---|---|---|---|
| 71499 | 4/18/2017 | $675,246.00 | variable | 12/31/2018 | 1 |
| 70999 | 5/18/2017 | $191,307.00 | variable | 5/15/2018 | 4 |
| 71532 | 5/3/2018 | $181,100.00 | variable | 12/15/2018 | 5 |

*See* Complaint ¶¶ 6-14, at 1-3; Answer ¶¶ 6-9, at 2.

The Defendant failed to timely make the December 2018 payment due on Loan 71499. *See* Complaint ¶¶ 16-18, at 3; Answer ¶ 18, at 2.[1] Because each loan document contains a cross-default provision, the Plaintiff accelerated the payments on all three loans and sent Defendant a default letter demanding payment of all money owed across all three loans within thirty days. *See* Complaint ¶¶ 17-18, at 3; Answer ¶¶ 11-12, at 2. The Defendant did not submit the demanded payment to the Plaintiff, *see* Complaint ¶ 19, at 3,[2] leading Plaintiff to file suit for liquidated

---

[1] Defendant contests Plaintiff's characterization of nonpayment on the debt as "default," arguing that "default" is a legal conclusion. *Compare* Complaint ¶ 16, at 3, *with* Answer ¶ 10, at 2. Yet the Defendant does not contest that the monies were due or that the Defendant failed to pay those monies on Loan 71499 by their due date. *See* Answer ¶¶ 6-9 & 22, at 2-3.

[2] Defendant purports to deny the assertion of nonpayment. *See* Answer ¶ 13, at 2. Yet the Defendant subsequently in the same document endeavors to justify the nonpayment on the theory that the Plaintiff induced the nonpayment by fraud. *See* Answer ¶¶ 22-24 & 26, at 3-5. The two positions are contradictory, and the Court concludes that the pleadings and from the parties' later Memorandum of Understanding that the Defendant admits to not having made the December 2018 payment on Loan 71499.

damages, contractual interest and fees, and attorney fees under the theory of breach of contract. *See* Complaint ¶¶ 21-27, at 3-4; Answer ¶¶ 15-17, at 2-3; *id.* ¶¶ 19-20, at 3.

In its Answer, Defendant affirmatively defended its nonpayment of payment on Loan 71499 due on December 31, 2018. Defendant states that it sought and received approval from Plaintiff to make the payment late so that it could sell cattle at a higher market price after the new year began. *See* Answer ¶ 22, at 3. According to the Defendant, the Plaintiff assured Defendant that Defendant's prospective failure to pay on December 31, 2018 would not constitute an event of default. *See id.* Defendant avers that it relied on Plaintiff's representation when it failed to pay on time, and it alleges that Plaintiff made the representation either recklessly or with fraudulent intent so that it could foreclose on property with a market value far in excess of the loaned amounts. *See* Answer ¶¶ 22-23, at 3.

The suit came before the federal courts as a case in diversity where the amount in controversy exceeds $75,000.00.[3] It on April 29, 2019 was transferred from the Dallas Division of this Court to the Amarillo Division on the order of United States District Judge Ed Kinkeade because all the events underlying Plaintiff's causes of action occurred in Hansford County. *See* ECF No. 6 (citing 28 U.S.C. § 124(a)(5)). Under the Amarillo Division's standing order of reference, the case was referred to United States Magistrate Judge Lee Ann Reno for pretrial management. *See* ECF No. 8. When Judge Reno recused herself, the case was then referred to United States Magistrate Judge Hal R. Ray, Jr. for further proceedings. *See* ECF No. 13. Under a scheduling order filed July 12, 2019, the parties were to complete pretrial motions by November 8, 2019. *See* ECF No. 18. After the parties failed to timely submit a joint estimate of trial length

---

[3]Plaintiff is a domestic bank that is organized under the laws of the State of Oklahoma, whereas Defendant is a corporation that is incorporated under the laws of the State of Texas. *See* Complaint ¶¶ 1-2, at 1; Answer ¶¶ 1-2, at 1. The Court has independently verified the states of incorporation for both parties via corporate registries maintained by the Secretary of State offices in Texas and Oklahoma.

and joint status report concerning the progress of settlement negotiations, Judge Ray extended the deadline for these final stages of pretrial management until November 22, 2019. *See* ECF No. 20.

In the Joint Estimate of Trial Length and Joint Status Report, filed November 22, 2019 (ECF No. 21) ("Joint Status Report"), the parties informed the Court that Plaintiff had posted notices of foreclosure sale on October 31, 2019 with respect to the Defendant's real property in Texas that had served as collateral for the loans at issue in this case. *See* Joint Status Report at 1. The parties further advised the Court that the Plaintiff had temporarily pulled the sale in consideration for a settlement agreement the parties had signed on October 1, 2019. *Id.*; *see also* Memorandum of Understanding 2-3, filed November 22, 2019 (ECF No. 21-1) ("MOU").

The parties agreed in the MOU to a schedule of sales or foreclosures in lieu of immediate foreclosure of the Defendant's Texas property. The sales were to proceed as in the flowchart below, which depicts the Court's summary of the relevant MOU deadlines and deliverables:

STAGED SALES AND FORECLOSURES

| October 2019 | November 2019 | December 2019 | January 2020 | February 2020 | March 2020 | April 2020 | May 2020 |
|---|---|---|---|---|---|---|---|

Sell Texas property

Insufficient funds / Foreclosure

Sell Oklahoma property

Insufficient funds / Foreclosure — Sell cattle

Insufficient funds / Foreclosure — Sell rest

Total sales > loan

Pay off loans

As a first step in attempting to satisfy its debt and avoid foreclosure, Defendant was to list on October 1, 2019 its real property in Hansford County, Texas and Ochiltree County, Texas for sale, pursuant to a listing agreement with a reputable and experienced firm and ranch broker. *See* MOU ¶ 3, at 1. If the Texas properties sold before December 29, 2019 in an amount sufficient to repay the Defendant's outstanding loans, the Defendants agreed to repay the loans out of the sale proceeds. If, on the other hand, the Texas properties did not sell before December 29, 2019 or sold for less than the outstanding value of the loans, then the Defendant agreed not to take any steps to delay or stop foreclosure of those properties and to list all its property in Beaver County, Oklahoma for sale the same day. *See* MOU ¶¶ 5-7, at 1. If the Oklahoma property sold at a price that – combined with any proceeds from the sale of the Texas properties – was greater than the debt owed to Plaintiff, then the Defendants were to satisfy their debt. If, on the other hand, the Oklahoma properties did not sell before March 20, 2020 or sold for less than the outstanding value of the loans, then the Defendants agreed not to take any steps to delay or stop foreclosure of the Oklahoma property and to immediately begin to sell as many of its cattle as necessary to make up the balance of payment due. *See* MOU ¶¶ 8-9, at 1-2. If any debt remained after sale of all its cattle, Defendant agreed to immediately liquidate all remaining collateral until the loan obligation was paid in full, or else enter into an agreed judgment in an amount equal to any remaining unpaid balance owed to Plaintiff. *See* MOU ¶ 10, at 5. Finally and separately, Defendant agreed:

> Until all FSB Obligations [of the Defendant] . . . are paid in full . . . not to pledge or otherwise encumber the Texas Property, the Oklahoma Property, the other collateral or any of the other assets, and/or real property of the [Defendant] that are listed on the financial statements previously provided to FSB without the express written consent of FSB.

*See* MOU ¶ 11, at 2.

The Defendant did not list the Texas property for sale as required in the MOU. *See* Plaintiff First Security Bank's Opposition to Defendant's Motion for Temporary Restraining Order ¶¶ 10-12, at 2, filed January 31, 2020 (ECF No. 25) ("Opposition to TRO"); W&W Farms, Inc.'s Response to First Security Bank's Opposition to Defendant's Motion for Temporary Restraining Order 2, filed February 2, 2020 (ECF No. 26) ("Response to Opposition to TRO"). Instead, the Defendants applied for a loan from another bank in Oklahoma that would fully pay and discharge all its debt to the Plaintiff and that was secured by the same property that was to go into foreclosure under the MOU on December 29, 2019. *See* Motion for TRO ¶ 3, at 1. The Defendant communicated to the Plaintiff that it had a pending loan arrangement with the other bank, and the Plaintiff objected to this application even as it sought information about it. *See* W&W Farms, Inc.'s Memorandum in Support of Motion for Temporary Restraining Order ¶ 9, at 3, filed January 31, 2020 (ECF No. 23) ("Memorandum in Support"). Defendant asserts that Plaintiff thereafter attempted to thwart its ability to finalize the loan from the other Oklahoma bank by responding slowly to requests for documents. *See* Memorandum in Support ¶ 10, at 4-6. The loan had not been finalized by the sale deadline of December 29, 2019, and the Plaintiff wrote the Defendant on December 30, 2019, notifying Defendant of its purported breach of the MOU, of the Plaintiff's authority under the MOU to post the Texas property for foreclosure, and of the Defendant's obligation under the MOU to now list the Oklahoma property for sale. *See* Opposition to TRO 13.

On January 13, 2020, Plaintiff sent to Defendant via certified mail with return receipt a notice of foreclosure on the Texas properties identified in the MOU. *See* Appendix in Support of W&W Farms, Inc.'s Memorandum in Support of Motion for Temporary Restraining Order 65, filed January 31, 2020 (ECF No. 24). Defendant's Texas property is scheduled for a foreclosure sale on February 4, 2020. *See* Motion for TRO ¶1, at 1. Defendant therefore now moves the Court

for a TRO that would restrain the Plaintiff from selling or otherwise taking possession of that property. *See* Motion for TRO at 2. Defendant avers that there is a substantial likelihood that it will prevail on the merits of the underlying loan and contract dispute and that is has a probable right of recovery for the counterclaim of fraud that it brings against the Plaintiff. *See* Memorandum in Support ¶ 11, at 7. Defendant maintains that the uniqueness of the property would make its loss a source of irreparable harm to the Defendant and would make its sole legal remedy of monetary damages in a lawsuit for wrongful foreclosure completely inadequate. *See* Memorandum in Support ¶¶ 15-18, at 8-9. Defendant posits that the harms that it would suffer from the foreclosure outweigh the harms that the Plaintiff would suffer if the Court grants the requested TRO. *See* Memorandum in Support ¶ 19, at 9-10. Lastly, the Defendant asserts that issuance of the TRO would not adversely affect the public interest or public policy. *See* Memorandum in Support ¶ 21, at 10.

The Plaintiff filed an opposition to the Motion for TRO on January 31, 2020. In that filing, the Plaintiff asserts that it initially postponed the scheduled October 1, 2019 foreclosure on the property at issue in an effort to resolve differences with the Defendant and to end the multiple cases they have brought against each other in Texas and Oklahoma. *See* Opposition to TRO ¶¶ 8-9, at 2. Plaintiff maintains that Defendant refused to list its Texas property for sale as agreed to in the MOU and thereafter applied for the loan with another bank despite Plaintiff's opposition to the application. *See* Opposition to TRO ¶¶ 10-12, at 2. Plaintiff turns the Court's attention to language in the MOU that permits Plaintiff to foreclose on the Texas property if it was not sold by December 29, 2019. *See* Opposition to TRO ¶ 14, at 3. Lastly, in implicit reference to TRO criteria, the Plaintiff relates that Defendant (acting individually rather than corporately) stated in deposition testimony that the land at issue is a portion of much larger landholdings and is not a residential

homestead. *See* Opposition to TRO ¶ 15, at 3. From these last two assertions, Plaintiff concludes that the property at issue is not unique or essential to the Defendant's business operations. *See id.*

Defendant two days ago filed its response to the Plaintiff's opposition to Defendant's Motion for TRO. *See* W&W Farms, Inc.'s Response to First Security Bank's Opposition to Defendant's Motion for Temporary Restraining Order, filed February 2, 2020 (ECF No. 26) ("Response to Opposition to TRO"). In the response, the Defendant does not contest that it failed to post the Texas property for sale as the MOU required. *See* Response to Opposition to TRO at 4. Nevertheless, the Defendant asserts that it took "action designed to achieve the same result, i.e. obtaining a loan to fully pay and discharge all the FSB debt." *Id.* Defendant then describes how the Plaintiff failed to quickly respond to document requests to facilitate Defendant's attempts to obtain the new loan with another bank. *See id.*

The Plaintiff petitioned the Court for leave to file a sur-reply Sunday evening. *See* Plaintiff First Security Bank's Supplement to Its Opposition to Defendant's Motion for Temporary Restraining Order and Sur-Reply to Defendant's Response to Plaintiff's Opposition ¶ 1, at 1, filed February 2, 2020 (ECF No. 27) ("Sur-Reply"). Therein, the Plaintiff reiterates its position that the Defendant breached the MOU. *See* Sur-Reply ¶ 4, at 2. Plaintiff then rejects Defendant's assertion that Plaintiff's delays in responding to emailed requests for information to process the new loan hampered Defendant's ability to complete a new agreement with complex, multi-party requirements in the two weeks before the December 29, 2019 property sale deadline set in the MOU. *See* Sur-Reply ¶ 5, at 2.

## LEGAL STANDARDS

A federal court sitting in equity has the power to issue a temporary restraining order. FED. R. CIV. P. 65. The standard for a temporary restraining order ("TRO") is generally the same as the

standard for a preliminary injunction. *See May v. Wells Fargo Home Mortg.*, 2013 WL 2367769, at *1 (N.D. Tex. May 30, 2013) (Fitzwater, C.J.) (quoting *Asadoorian v. Travis*, 2011 WL 2224984, at *1 (D. Mass. June 7, 2011)). The standard for a preliminary injunction consists of four factors that Plaintiff must establish: "(1) a substantial likelihood of success on the merits; (2) a substantial threat of irreparable harm if the injunction is not granted; (3) that the threatened injury outweighs any harm that may result from the injunction to the non-movant; and (4) that the injunction will not undermine the public interest." *Valley v. Rapides Parish School Bd.*, 118 F.3d 1047, 1051 (5th Cir. 1997) (citing *Roho Inc. v. Marquis*, 902 F.2d 356, 358 (5th Cir. 1990)); *see also Clark v. Prichard*, 812 F.2d 991, 993 (5th Cir. 1987); *Winter v. Natural Resources Defense Council, Inc.*, 555 U.S. 7, 20 (2008).

### ANALYSIS

The Court's analysis of the Motion for TRO follows the four factors for a TRO listed above and considers prevention of the scheduled foreclosure sale of Defendant's Texas properties today as the ultimate relief that Defendant is requesting. Accordingly, in analyzing the first prong in the temporary restraining order test, the Court will also analyze whether Defendant is substantially likely to succeed on the merits of its argument that foreclosure would be wrongful on account of fraudulent misrepresentation by the Plaintiff.

### 1. Substantial Likelihood of Success on the Merits

The Court first examines the question of whether the Defendant is likely to succeed on the merits of this case. Both the Defendant and the Plaintiff agree that the Defendant failed to timely make the December 2018 payment due on Loan 71499. *See* Complaint ¶¶ 16-18, at 3; Answer ¶ 18, at 2. Yet the Defendant seeks to excuse its nonpayment on the allegation that it sought and received approval from Plaintiff to make the payment late without the late payment constituting

an event of default. *See* Answer ¶ 22, at 3. Defendant first discerns in this purported verbal assurance an amendment to the loan agreement that made it wrongful for the Plaintiff to initiate foreclosure on the properties serving as collateral for the loan. The Defendant further asserts that the purported assurance from the Plaintiff also amounts to negligent misrepresentation or fraud. The Court concludes that the Defendant is *not* substantially likely to prevail on any of these arguments.

### A. *Choice of law*

Neither party briefs the Court on which state's law to apply. Upon its independent analysis, the Court identifies the following text in Promissory Note 71499 and Agricultural Security Agreement 71499: "This Agreement will be governed by federal law applicable to Lender and, to the extent not preempted by federal law, the laws of the State of Oklahoma, without regard to its conflicts of law provisions. This Agreement has been accepted by Lender in the State of Oklahoma." Promissory Note at 6 & 10 (emphasis omitted).

Oklahoma's Uniform Commercial Code ("Oklahoma U.C.C.") states that, by default, Oklahoma applies the law of the jurisdiction in which the receiving bank is located. *See* Okla. U.C.C. § 12A-4A-507(a)(1). Under the Oklahoma U.C.C., this default is overridden whenever the parties to a contract select the law of a different jurisdiction to govern rights and obligations between each other. U.C.C. § 12A-4A-507(b). In this case the default rule and the parties' choice of law provision in the Promissory Note and Agricultural Security Agreement do not come into conflict; therefore, the final clause in the text above does not alter the Court's rule of law analysis.

Consequently, the Court applies Oklahoma statutes and jurisprudence to all questions arising under contract law to determine if the Defendant is substantially likely to succeed on the merits of the underlying case — specifically, on Defendant's argument that Plaintiff verbally

amended Promissory Note 71499 to allow for late repayment of the debt. Because Texas law governs *processing* of foreclosure cases, *see* TEX. PROP. CODE ANN. § 51.002, the Court also examines whether the Defendant is substantially likely to succeed under Texas law. Regardless of whether the Court applies Oklahoma or Texas law, it FINDS that the Defendant *is not* substantially likely to succeed on the merits and therefore does not satisfy the first prong of the TRO analysis.

### *Argument #1: Amendment of Promissory Note 71499*

Promissory Note 71499 states in its paragraph on payment terms that all payments "must be received by Lender consistent with any written payment instructions provided by Lender." Promissory Note for Loan 71499, at 1, filed April 23, 2019 (ECF No. 1-1) ("Promissory Note"). In the Promissory Note's paragraph on default, it specifies that an event of default shall occur if "Borrower fails to make any payment when due under this Note." Promissory Note at 1. In the same paragraph, the Promissory Note also indicates that default will occur is a borrower fails "to comply with or to perform any term, obligation, covenant or condition contained in **any other agreement** between Lender and Borrower." Promissory Note at 1 (emphasis added). The Promissory Note contains a cure provision, but this provision does not extend to payment defaults. *See* Promissory Note at 2. Instead, it declares that upon default, "Lender may declare the entire unpaid principal balance under this Note and all accrued unpaid interest immediately due, and then Borrower will pay that amount." *Id.* Similar language is to be found in in Loan 71499's Agricultural Security Agreement. *See* Promissory Note at 6. Importantly and lastly, the Agricultural Security Agreement states among its "Miscellaneous Provisions":

> This Agreement, together with any Related Documents, constitutes the entire understanding and agreement of the parties as to the matters set forth in this Agreement. All prior and contemporaneous representations and discussions concerning such matters either are included in this document or do not constitute an aspect of the agreement of the parties. Except as may be specifically set forth in this Agreement, no conditions precedent or **subsequent**, of any kind whatsoever,

exist with respect to Grantor's obligations under this Agreement. No alteration of or amendment of this Agreement shall be effective unless given in writing and signed by the party or parties sought to be charged or bound by the alteration or amendment.

*See id.* at 10.

Under Oklahoma law — both statutory and jurisprudential — a verbal modification of a written contract will not suffice to *amend* the written contract absent "positive, clear, and convincing proof." State statute categorizes all loan agreements and all agreements to modify a loan agreement as "credit agreements." 15 OKLA. ST. ANN. § 140(A)(1). As soon as a credit agreement or any other contract is committed to writing, it supersedes all the oral negotiations or stipulations concerning the matter which preceded or accompanied the execution of the written instrument. *See* 15 OKLA. ST. ANN. § 137. Even though an oral contract may be altered by a subsequent written contract, *see* 15 OKLA. ST. ANN. § 236, a *written* contract can be altered by a subsequent oral agreement only if that oral agreement both is established by positive, clear, and convincing proof and has been fully executed, *see* 15 OKLA. ST. ANN. § 237; *Dewberry v. Universal C.I.T. Credit Corp.,* 415 P.2d 978, 979 (Okla. 1966). No verbal modification to the terms of a written credit agreement subject to Oklahoma law creates a right of action for a contracted party to enforce or seek damages for breach of contract if the principal of the loan is greater than $15,000.00. 15 OKLA. ST. ANN. § 140(B).

The United States Court of Appeals for the Tenth Circuit has applied these state statutory provisions in a way that cuts against the likelihood of the Defendant's success on the merits. In *Walker v. First National Bank of Medicine Lodge,* 129 Fed. Appx. 411 (10th Cir. 2005), the court employed plain language analysis to determine that loan agreements in excess of $15,000.00 are credit agreements within the meaning of 15 OKLA. ST. ANN. § 140. Subsequently in *DCR Fund I, LLC v. TS Family Ltd. Partnership,* 261 Fed. Appx. 139 (10th Cir. 2008), the Tenth Circuit

considered a case with facts similar to those in the instant case: A defendant who had not made a scheduled payment on a promissory note and faced foreclosure of its collateralized property alleged that the plaintiff bank had orally agreed to defer payments. *See* 261 Fed. Appx. at 140. The district court in that case had "rejected as a matter of law all affirmative defenses based on alleged oral agreements. Specifically, the court [had] concluded the alleged oral agreements, which contradicted the express terms of the loan documents, ran afoul of the parol evidence rule, the notes' integration clauses, and Oklahoma's statute of frauds." 261 Fed. Appx. at 143. The Tenth Circuit upheld the district court's analysis of the law. *See* 261 Fed. Appx at 144. Later in its opinion, the Tenth Circuit also rejected the defendant's assertion on appeal that the verbal agreement had been executed due to a lack of clear and convincing evidence of execution. *See* 261 Fed. Appx. at 145.

Here, Defendant repeatedly alleges the existence of a verbal modification to the written loan agreement without providing any evidence of either the existence or the execution of such a verbal modification — much less the "positive, clear, and convincing proof" required under Oklahoma law. *See, e.g.*, Memorandum in Support of TRO ¶¶ 4-5, at 2-3; Memorandum in Support of TRO ¶ 12, at 8. Absent clear and convincing evidence that the alleged verbal modification to the loan agreement was fully executed, thereby altering the written contract, the terms of the written loan agreement remain unmodified. Under those written terms, Defendant's stipulated non-payment of the debt constituted a default and triggered Plaintiff's option to foreclose on the collateralized property. As such, the Court FINDS that the Defendant is not substantially likely to succeed on the merits if Oklahoma state law is applied.

Alternative analysis of whether an alleged verbal modification of a written contract would modify the terms of that contract under Texas law similarly calls into question the Defendant's

likelihood of prevailing on the merits of the case. Under Chapter 26 of the Texas Business and Commerce Code, all loan agreements must be in writing. *See* Tex. Bus. & Com. Code Ann. § 26.02 ("Business and Commerce Code"). Texas includes promissory notes within its definition of loan agreements unless the promissory note relates to credit cards or charge cards. *See* Tex. Bus. & Com. Code Ann. § 26.02 (2). The same section of the Business and Commerce Code requires that:

> (b) A loan agreement in which the amount involved in the loan agreement exceeds $50,000 in value is not enforceable unless the agreement is in writing and signed by the party to be bound or by that party's authorized representative.

> (c) The rights and obligations of the parties to an agreement subject to Subsection (b) of this section shall be determined solely from the written loan agreement, and any prior oral agreements between the parties are superseded by and merged into the loan agreement

> (d) An agreement subject to Subsection (b) of this section may not be varied by any oral agreements or discussions that occur before or contemporaneously with the execution of the agreement.

> (e) In a loan agreement subject to Subsection (b) of this section, the financial institution shall give notice to the debtor or obligor of the provisions of Subsections (b) and (c) of this section. The notice must be in a separate document signed by the debtor or obligor or incorporated into one or more of the documents constituting the loan agreement. . . . The notice must state substantially the following: "This written loan agreement represents the final agreement between the parties and may not be contradicted by evidence of prior, contemporaneous, or **subsequent oral agreements of the parties. There are no unwritten oral agreements between the parties.**

> (f) If the notice required by Subsection (e) of this section is not given on or before execution of the loan agreement or is not conspicuous, this section does not apply to the loan agreement, but the validity and enforceability of the loan agreement and the rights and obligations of the parties are not impaired or affected.

Tex. Bus. & Com. Code Ann. § 26.02 (b)-(f) (emphasis added). In other words, Texas business and commerce law does not permit a party to verbally amend a loan agreement for more than $50,000.00 unless the lender failed to incorporate notice of this state law prohibition into the loan

agreement or related documents. Here the Agricultural Security Agreement, incorporated into the Promissory Note, provided the Defendant with such notice. *See* Promissory Note at 10. Thus noticed, the Defendant knew or should have known that any verbal assurance provided by the Plaintiff – if any was given – would be invalid unless memorialized in writing and signed by the Plaintiff. For this reason, the Defendant is not likely to prevail on its theory that it avoided default when it admittedly missed the December 31, 2018 payment due on Loan 71499, even if it received a verbal assurance from Plaintiff that the missed payment would not constitute default.

### *Argument #2: Negligent Misrepresentation*

Oklahoma and Texas both have adopted the Restatement (Second) of Torts § 552 for negligent misrepresentation. *See Stroud v. Arthur Andersen & Co.*, 37 P.3d 783, 793-94 (Okla. 2001); *Grant Thorton LLP v. Prospect High Income Fund*, 314 S.W.3d 913, 920 (Tex. 2010) ("For nearly two decades, we have similarly embraced the Restatement approach."). As such, the Court's analysis of the Defendant's negligent misrepresentation claim must consider the same set of factors regardless of which state's law the Court applies to this case.

The Restatement (Second) of Torts Section 552 outlines five elements of negligent misrepresentation. First, a defendant must make a representation in the course of its business or in pursuit of a transaction in which it has a financial interest. Second, the defendant must supply "false information" to "guide" others in their own business. Third, the defendant must fail to "exercise reasonable care" in gathering or disseminating the false information. Fourth, the plaintiff must suffer a financial loss due to its "justifiable reliance" on the defendant's representations. Fifth and finally, the defendant's negligent misrepresentation must proximately cause the plaintiff's injury. Restatement (Second) of Torts § 552; *see Bowman v. Presley,* 212 P.3d 1210, 1217-18 (Okla. 2009); *Willis v. Marshall*, 401 S.W.3d 689, 698 (Tex. Ct. App. – El Paso, Apr. 24, 2013).

The requirement for the Defendant to prove *all* these elements is of import in this analysis. Based on the Defendant's account of events, any verbal assurance that the Plaintiff gave as to amending the terms of the Promissory Note may satisfy the first through third elements. However, the fourth element likely would defeat the Defendant's argument due to its "justifiable reliance" clause. In *Ragland v. Shattuck National Bank,* 36 F.3d 983 (10th Cir. 1994), the Tenth Circuit held that Oklahoma law on negligent misrepresentation requires that reliance be reasonable. 36 F.3d at 991. In *Grant Thorton LLP*, the Supreme Court of Texas held that reliance must be justifiable, and that there are "red flags" indicating that reliance upon a representation is unwarranted and therefore that reliance upon that representation cannot be characterized as reliable. 401 S.W.3d at 923. When analyzing what would qualify as such a "red flag," the United States Court of Appeals for the Fifth Circuit twice explained that a sophisticated investor who relies on the verbal tax advice of a certified public accountant without additional research has *not* justifiably relied on the accountant's advice. *See Lewis v. Bank of Am. NA*, 343 F.3d 540, 546 (5th Cir. 2003); *In re Mercer*, 246 F.3d 391, 418 (5th Cir. 2001). As a sophisticated borrower and corporation with extensive landholdings in multiple states, the Defendant faces a challenge similar to that of the sophisticated investor in *Lewis v. Bank*. Even if the Defendant was verbally told by the Plaintiff that a missed payment would not trigger default on Loan 74199, the Defendant arguably was not justified or reasonable in relying upon that representation without further investigation – especially given explicit contractual provisions that required any amendment to the Promissory Note to be memorialized in a signed writing.[4]

---

[4] As best the Court has been able to determine based on its research in response to this eleventh-hour motion, neither Oklahoma nor Texas explicitly has adopted Restatement (Second) of Torts §§ 537-540 — which form part of the American Law Institute's discussion about negligent misrepresentation — even though both states have adopted the Restatement's negligent misrepresentation elements in Section 552. Yet the Court's analysis above also comports with the requirement in those sections of the Restatement that a party is not justified in relying on the truth of a misrepresentation if he or she could have ascertained the falsity of the representation had he or she investigated it. *See* Restatement (Second) of Torts § 540. According to the Restatement, this duty to investigate especially applies when

### Argument #3: Fraud

Because the elements of fraud are more difficult to satisfy than are the elements of negligent misrepresentation, the Court is even *more* skeptical that Defendant is likely to prevail on the merits of its allegation that it did not fall into default on Loan 74199 because of the Plaintiff's fraud — whether the Court were to apply Oklahoma or Texas law.

Under Oklahoma law, "fraud" is broadly defined to include any act designed to gain an unfair advantage over another. *Ragland v. Shattuck Nat. Bank,* 36 F.3d at 990. To be actionable, however, the Supreme Court of Oklahoma has held that a fraud must contain a "false material representation made as to a positive assertion which is known either to be false, or made recklessly without knowledge of the truth [or falsity], with the intention that it be acted upon, and which is relied upon by a party to his/her detriment." *Tice v. Tice,* 672 P.2d 1168, 1170 (Okla. 1983). *Accord Rogers v. Meiser,* 68 P.3d 967 (Okla. 2003). Pertinent here and weighing in Defendant's favor, fraud can be predicated upon a promise to do something in the future, *see id.*, such as, for example, agreeing not to consider a missed loan payment as default that can trigger foreclosure proceedings. Weighing against the Defendant, however, fraud "is never assumed, but must be proven by clear and convincing evidence," 672 P.2d at 1171. Here the Court doubts based on the current pleadings that the Defendant is likely to succeed on its claim of fraud, not least of all because the Defendant has not offered any evidence that the Plaintiff ever made the alleged verbal assurance that the loan could be repaid after its due date. Even if the Defendant were somehow able to obtain such evidence through discovery, proving both knowledge of falsity and fraudulent intent would

---

a party could ascertain the veracity of the statement without considerable trouble or expense. *See* Restatement (Second) of Torts § 540 (cmt. a). The Court believes that examples of such low-cost investigation would include the options that the Defendant had to either ask for the alleged loan modification in writing or read the loan agreement to determine whether the alleged verbal modification conformed to the provisions of the written contract.

represent sufficiently significant challenges that the Court *ex ante* cannot conclude that the Defendant is substantially likely to be able to prove them by clear and convincing evidence.

Under Texas state law, a claim of fraud only will succeed is the movant proves that the other party: (i) made a material representation that was false; (ii) knew the representation was false or made it recklessly as a positive assertion without any knowledge of its truth; (iii) intended to induce the movant to act upon the representation; and (iv) induced actual and **justifiable** reliance upon the representation by the movant that resulted in injury to the movant. *See Italian Cowboy Partners, Ltd. v. Prudential Ins. Co. of Am.*, 341 S.W.3d 323, 337 (Tex. 2011); *Ernst & Young, L.L.P. v. Pacific Mut. Life Ins. Co.*, 51 S.W.3d 573, 577 (Tex. 2001) (emphasis added). Fifth Circuit precedent interpreting and applying the Texas law concerning justifiable reliance in fraud cases requires that the Court inquire whether "given a fraud plaintiff's individual characteristics, abilities, and appreciation of facts and circumstances at or before the time of the alleged fraud [,] it is extremely unlikely that there is actual reliance on the plaintiff's part." *Haralson v. E.F. Hutton Group, Inc.*, 919 F.2d 1014, 1026 (5th Cir. 1990). Stating its position in even starker terms in a later case, the Fifth Circuit held that even though the justifiable reliance element of common law fraud does not require a movant to demonstrate reasonableness, a fraud movant "cannot recover if he blindly relies upon a misrepresentation the falsity of which would be patent to him if he had utilized his opportunity to make a cursory examination or investigation." *Lewis v. Bank,* 343 F.3d at 540 (internal citations omitted). The Fifth Circuit also has applied its "red flag" analysis on negligent misrepresentation to claims of fraud. *See In re Mercer* at 418.

Even if the Court were to grant *arguendo* that the Defendant would be likely to substantively prevail on the first three elements of its fraud claim, the Court believes that the Defendant would be unlikely to prevail on the fourth prong of justifiable reliance for the same

reasons laid out in the above discussion about negligent misrepresentation. For all the foregoing reasons, the Court FINDS that the Defendant has failed to show a substantial likelihood of success on the merits for the purposes of a TRO.

## 2. Substantial Threat of Irreparable Harm

Because the Defendant fails to show a substantial likelihood of success on the merits of the case, the Court need not analyze the other TRO prongs. Nevertheless, even if the Defendant were likely to prevail on the merits, the Court finds that the Defendant would not suffer irreparable harm absent the extraordinary remedy of a TRO, regardless of whether the Court applies Oklahoma or Texas law.

To constitute irreparable harm warranting the issuance of a TRO under Oklahoma law, the Defendant would need to show an injury that is certain, great, actual, and not theoretical. *See Heideman v. Salt Lake City,* 348 F.3d 1182, 1189 (10th Cir. 2003). The Tenth Circuit has noted that determining whether irreparable harm exists can be a difficult and close question, *see Dominion Video Satellite, Inc. v. Echostar Satellite Corp.*, 356 F.3d 1256, 1262 (10th Cir. 2004), that "does not readily lend itself to definition," *Prairie Band of Potawatomi Indians v. Pierce,* 253 F.3d 1234, 1250 (2001). Yet even if a definition is difficult to pin down, the Tenth Circuit is clear that proving irreparable harm is not "an easy burden to fulfill." *Greater Yellowstone Coalition v. Flowers,* 321 F.3d 1250, 1258 (10th Cir. 2003). At the very least, the sustained injury "must be both certain and great, and . . . must not be merely serious or substantial." *Prairie Band of Potawatomi Indians,* 253 F.3d at 1250. Given that the property scheduled for foreclosure consists of two commercial tracts that the Defendant owns among thousands of acres of property across Oklahoma and Texas, the Court cannot confidently decide based on the papers that the harm of foreclosure meets this strict requirement. This is especially true given the potential future remedies

of damages for wrongful foreclosure and redemption that the Defendant identifies and that the Court discusses in more detail below.

Texas law is more favorable to the Defendant's argument, insofar as the Texas courts typically have held that land *in se* is a unique asset because market economics cannot fully account for the total value of that property to the landowner. *See, e.g.*, *Perales v. Riviera,* 2003 WL 21705740, at *3 (Tex. App. – Corpus Christi July 24, 2003); *El Paso Dev. Co. v. Berryman*, 729 S.W. 2d 883, 888 (Tex. App. – Corpus Christi 1987). Yet even here the Defendant does not account for a distinguishing feature prominent in most such state court decisions — even in those cases to which the Defendant points the Court in its Memorandum in Support of TRO: the property to be foreclosed upon usually is the primary residence of the movant for a TRO. *See, e.g.*, *Baker v. U.S. Housing and Urban Development,* 2019 WL 7759504, at *4-5 (W.D. Tex. Oct. 2, 2019) (slip op); *Ainsworth v. Wells Fargo Home Mortgage, Inc.,* 2018 WL 3406943, at *3 (N.D. Tex. June 21, 2018); *Stewart Beach Condo. Homeowners Ass'n, LLC,* 481 S.W.3d 336, 345 (Tex. App. – Houston 2015); *Franklin Sav. Ass'n v. Reese*, 756 S.W.2d 14, 15-16 (Tex. App. –Austin 1988).

Whereas the harm of losing one's home "is obvious" to the Texas courts, they have been less likely to identify irreparable harm in the loss of commercial property such as the property at issue in this case that is set for foreclosure on February 4, 2020. What counts for the Texas courts in commercial land foreclosure cases it not so much the magnitude of the loss but rather the "irreparability" of the loss. *See Enterprise Intern., Inc. v. Corporacion Estatal Petrolera Ecuatoriana,* 762 F.2d 464, 472-73 (5th Cir. 1985). In other words, the question before the Court is whether any loss the Defendant might sustain from a wrongful foreclosure could not be undone through monetary remedies. *See Hunt v. Banks Trust Co.,* 646 F. Supp. 59, 62 (N.D. Tex. 1986).

The Defendant itself identifies two such monetary remedies that could negate any wrongful harm caused by the foreclosure and therefore not make the harm "irreparable" as the Fifth Circuit and the Court have interpreted the term: (i) damages for wrongful foreclosure; and (ii) the right of redemption. Defendant concedes that the later remedy – right of redemption – would permit it to recover the property, but it insists that redemption could not reverse what it predicts would be irreparable harm to its reputation with borrowers and its corresponding ability to "borrow[] money at any other institution in the United States." Memorandum in Support of TRO at 9.

Interestingly, in the case that the Defendant cites in support of this proposition, the Texas Court of Appeals distinguished the fact pattern from the facts of another case the same court had decided seven years earlier. *See Guardian Sav. And Loan Ass'n v. Williams,* 731 S.W.2d 107, 109 (Tex. App. – Houston 1987). In that earlier case, the Texas Court of Appeals had held that foreclosure of the land at issue would not irreparably harm the movant because the movant had not explained *how* the land it claimed was unique actually was unique. *See Ginther-Davis v. Houston National Bank,* 600 S.W.2d 856, 865 (Tex. App. – Houston 1980). Based on the papers, this earlier case seems to the Court to be a closer analogue to the present case, in which the Defendant repeatedly asserts that the property at issue is unique but never explains what makes the land unique. *See* Memorandum in Support ¶¶ 15-17, at 8-9. *See, e.g.*, *Morgan v. Fletcher,* 518 F.2d 236, 239 (5th Cir. 1975)

More broadly, though, the Defendants fail to notice that damage to a movant's reputation as a borrower from a foreclosure proceeding – even in the case it cites – tends to apply only to those companies where the purchase and sale of property is the core business rather than a capital asset purchase, e.g. land development companies. *See Guardian Save and Loan Ass'n.* at 108-09. In other cases, reputational harm has not arisen to the level of *irreparable* harm that would justify

granting the extraordinary relief of a TRO. *See, e.g.*, *Sampson v. Murray,* 415 U.S. 61 (1974) (damage to reputation "falls far short of the type of irreparable injury which is necessary to predicate to the issuance of a temporary injunction"). Furthermore, the Defendant merely speculates that it will suffer reputational harm if the TRO is not granted, and speculative injuries are not sufficient to demonstrate irreparable harm. *See Holland America Insurance Co. v. Succession of Roy,* 777 F.2d 992, 997 (5th Cir. 1985). For all the foregoing reasons, the Court FINDS that the Defendant has not sufficiently proven that it will suffer irreparable harm if the foreclosure proceeds as scheduled.

### 3. Threatened Injury Outweighs Harm to Non-Movant

Defendant correctly notes that it may lose title and possession to the property scheduled for foreclosure if the Court does not issue a TRO against the foreclosure sale scheduled for today. Yet the Defendant does not direct the Court to any statutory authority or case law in support of its conclusion that the Court should consider that potential harm as outweighing the potential harm to the Plaintiff of further postponing a foreclosure sale that, but for the Plaintiff's temporary forbearance of the default remedies specified in the loan agreement, would have taken place in October of last year. Instead, the Defendant directs the Court to persuasive authority from a district court outside both the Fifth and Tenth Circuits even though that court's decision simultaneously undermines Defendant's argument about irreparability. *See Prudential Ins. Co. of America v. Inlay,* 728 F. Supp 2d 1022, 1031-32 (N.D. Iowa 2010). Restricting its research to cases that have fallen within the Fifth Circuit and Tenth Circuit, the Court notes that "balance of harms" analysis employs an unweighted, multifactor test that considers both economic and noneconomic harms to both parties. Because the Defendant has not sufficiently demonstrated that it would suffer irreparable injury from the foreclosure going forward, anything more than a *de minimis* harm to

the Plaintiff would preclude the Defendant from meeting its burden of proof on this prong for purposes of granting the extraordinary relief of a TRO. The Court has recognized that an unpaid creditor has both economic and noneconomic interests in repayment of monies owed to it and has a contractual right to foreclosure on property in accord with default provisions in a loan agreement. *See, e.g.*, *Federal Trade Commission v. IAB Marketing Associates, LP*, *2014 WL 11460394,* at *1 (N.D. Tex. Aug. 26, 2014). The Court therefore FINDS that Plaintiff has not met its burden for this prong. Furthermore, even if it did, that would not affect the outcome of this case as it pertains to the TRO because of the Defendant's failure to establish the first or second element required for the granting of a TRO.

### 4. Injunction Will Not Undermine Public Interest

The Court does not discern a developed argument on this prong in either the Defendant's Memorandum in Support of TRO or in the Plaintiff's Opposition to TRO. *See* Memorandum in Support of TRO ¶ 21, at 10; Opposition to TRO (not addressing this prong). The Defendant simply begs the question by stating that "[i]ssuance of a temporary restraining order would not adversely affect the public interest and public policy." Memorandum in Support of TRO ¶ 21, at 10. If more fully developed, the Court anticipates that this prong of the TRO analysis could be the strongest argument the Defendant could make in support of its Motion for TRO. Nevertheless, even if the Defendant were to prove this prong, its failure to prove any of the other three prongs would lead to the conclusion that the Court should deny the Motion for TRO.

### ORDER

It is therefore ORDERED that Defendant's request in its Motion for TRO (ECF No. 22) for a temporary restraining order against Plaintiff's foreclosure sale scheduled for today in Hansford County is DENIED. Nothing in this Memorandum Opinion and Order shall be construed

to prejudice either party should it decide to seek a preliminary injunction or permanent injunctive relief pursuant to Federal Rule of Civil Procedure 65.

**SO ORDERED.**

February __, 2020.

MATTHEW J. KACSMARYK
UNITED STATES DISTRICT JUDGE